UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **BATON ROUGE VENTURES, LLC, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 20-628-JWD-EWD** |
| **CEDAR GROVE CAPITAL, LLC** | |

### RULING AND ORDER

This matter comes before the Court on cross-motions for summary judgment. The first motion is the *Motion for Partial Summary Judgment* (Doc. 51) filed by Defendant Cedar Grove Capital, LLC ("Defendant"). Plaintiffs Baton Rouge Ventures, LLC and Charal Baton Rouge Ventures, LLC (collectively, "Plaintiffs") oppose the motion. (Doc. 69.) Defendant has filed a reply. (Doc. 76.)

The second is the *Motion for Summary Judgment on Plaintiff's Main Demand, Defendant's Counterclaim and alternatively, Motion for Partial Summary Judgment on the Defendant's Counterclaim* (Doc. 52) filed by Plaintiffs. Defendant opposes the motion, (Doc. 70), and Plaintiffs have filed a reply, (Doc. 75). Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, both motions are denied.

### I.     Relevant Factual Background

This case arises out of a contract to purchase and sell four apartment complexes in Baton Rouge, Louisiana. Plaintiffs, as co-owners in indivision, are the owners of certain real estate and improvements located at 3225 Victoria Drive, Baton Rouge, LA ("Bellemont Victoria I"); 12254 La Margie Avenue, Baton Rouge, LA ("Bellemont Victoria II"); 567 Sharp Lane, Baton Rouge, LA ("Park East I"); and 655 Sharp Lane, Baton Rouge, LA ("Park East II") (collectively, the

"Properties"). (*See* Plaintiffs' *Statement of Uncontested Facts* ("*Pl. SUF*" ¶ 1, Doc. 52-2); *Cedar Grove's Traversal of Plaintiffs' Statement of Uncontested Facts* ("*Def.* O*SUF*" ¶ 1, Doc. 70-11).)[1]

On February 19, 2020, Cedar Grove entered into a Purchase Agreement (the "PSA") with Plaintiffs to buy the Properties for $42,500,000.00. (*See* Defendant's *Statement of Material Facts Not in Dispute* ("*Def. SMF*" ¶ 1, Doc. 51-2); Plaintiffs' *Opposing Statement of Material Facts* ("*Pl. OSMF*" ¶ 1, Doc. 69-1); *see also* PSA, at 2 ¶ 2.)[2] Plaintiffs signed the Purchase Agreement on February 20, 2020. (PSA, Doc. 69-2 at 14-15.) However, the Effective Date under the Purchase Agreement was February 19, 2020. (*Def. SMF* ¶ 2.)

The Due Diligence Period was to commence on the date of execution and continue for forty-five days thereafter. (*Def. SMF* ¶ 3.) Specifically, Section 4 of the Purchase Agreement, "Due Diligence Period" provides:

> Commencing on the date in which Buyer and Seller have executed this Purchase Agreement and continuing for forty-five (45) days thereafter (the "Due Diligence Period"), Buyer, at Buyer's sole expense, may investigate the condition of the Property and its suitability for Buyer's planned use and any other matters that may be relevant to Buyer, in its sole discretion; provided that, in the event that the Due Diligence Materials are not timely delivered within time period set forth in Section 9(a)[3] below, then the Due Diligence Period shall be extended by the duration of such delay. In addition to the investigations of the physical condition of the Property and without limiting the generality of the foregoing, Buyer's investigations may include market and feasibility studies, title, survey, the availability and cost of utilities, as well as any other matters Buyer deems necessary to inspect or investigate in its sole discretion. During the Due Diligence Period, Seller shall permit Buyer to review all the records of the Property in the possession or control of Seller, including contracts, leases, surveys, title documents, plans, property records and utility bills pertaining to the Property. Buyer shall have the right to terminate this Purchase Agreement by providing a written notice of termination to Seller on or before the end of the Due Diligence Period if Buyer determines, in Buyer's sole and absolute discretion, that the Property is not suitable

---

[1] When the *Pl. SUF* is cited by paragraph number to support a particular fact, that fact is undisputed. *See* M.D. La. LR 56(c), (g).
[2] Likewise, when the *Def. SMF* is cited by paragraph number to support a particular fact, that fact is undisputed. *See* M.D. La. LR 56(c), (g).
[3] Although the PSA states, "Section 9(a)," the parties agree this is a clerical error and should be a reference to Section 10(a).

2

> to Buyer for any reason whatsoever or for no reason at all. If Buyer terminates this Purchase Agreement as permitted in this Section 4, the Deposit (less the Hard Money) shall be returned to Buyer in full and neither party shall have any further rights or obligations hereunder.

(PSA, Doc. 69-2 at 3, § 4.) Numerous factual disputes exist in this case as to the commencement, end, and/or extension of the Due Diligence Period.

Section 6 of the PSA, "Access and Approvals" provides that:

> *From the Effective Date of this Agreement until the Closing Date*, or earlier termination of this Purchase Agreement, *Buyer and its representatives, consultants and engineers shall have reasonable access to and the right to inspect the Property* and surveys and other tests so long as the tests are conducted in a manner not to interfere with the tenants occupying the Property and the ongoing business of the Sellers. Buyer shall provide notice to Seller at least twenty-four (24) hours prior to accessing the Property.…
>
> *Buyer and its third-party consultants shall maintain (a) commercial general liability insurance* with coverages of not less than $1,000,000.00 for injury or death to any one person and $2,000,000.00 for injury or death to more than one person and $1,000,000.00 with respect to property damage, *and (b) worker's compensation insurance in accordance with the law of the state in which the Property is* located[.] Buyer *shall deliver proof of the insurance coverage required (in the form of a certificate of insurance naming Seller as an additional insured) prior to Buyer or any of its representative's entry onto the Property.*

(PSA, Doc. 69-2 at 3, § 6 (emphasis added).) There is conflicting evidence as to whether a site visit was able to be performed by Cedar Grove in accordance with Section 6 of the PSA.

Section 10 of the Purchase Agreement, "Seller's Pre-Closing Obligations" provides that, in addition to "the other obligations set forth in this [PSA], Seller shall comply with the following pre-closing obligations:"

> (a) Within five (5) business days after the Effective Date, Seller shall deliver to Buyer copies of the following written materials if in its possession or control relating to the Property: title insurance policies or other title reports and copies of any title exceptions; surveys, including, but not limited to, topographic and boundary surveys; environmental site assessments or reports; copies of the Leases; and all contracts, service agreements, maintenance agreements, vendor agreements,

3

and other agreements affecting or providing services to the Property, (the "Due Diligence Materials")…[4]

(PSA, Doc. 69-2 at 7-8, § 10.)

The Closing Date was to "occur on or before forty-five days after the end of the Due Diligence Period." (*Def. SMF* ¶ 4.) Section 12 of the Purchase Agreement, "Closing" provides: "The Closing shall occur before Buyer's title company, namely Madison Title Agency… At the Closing, Seller shall convey the Property to Buyer and Buyer shall pay the Purchase Price to Seller." (PSA, Doc. 69-2 at 10, § 12.)

There is a dispute as to when Closing was set to occur and Defendant's ability to pay the Purchase Price at Closing. However, it is undisputed that the Closing was not subject to the condition that Cedar Grove obtain financing. (*Pl. SUF* ¶ 40.) It is also undisputed that no Closing occurred in this case. (*Pl. SUF* ¶ 24.)

## II.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the

---

[4] There are two subpart (a)'s in Section 10 due to a typographical error. However, the parties agree that the one reproduced above is the only one relevant for purposes of the motions.

record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (internal citations omitted). Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (internal citations omitted).

Also important here, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure [(that is, beyond doubt)] *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986); *peradventure*, MERRIAM-WEBSTER'S DICTIONARY (2019), https://www.merriam-webster.com/dictionary/peradventure (last visited Aug. 29, 2022). *See also Universal Sav. Ass'n v. McConnell*, 14 F.3d 52 (5th Cir. 1993) (unreported) ("Where the summary judgment movant bears the burden of proof at trial, the summary judgment evidence must affirmatively establish the movant's entitlement to prevail as a matter of law."). That is,

> In contrast, if the movant bears the burden of proof on a claim at trial, then its burden of production is greater. It must lay out the elements of its claim, citing the facts it believes satisfies those elements, and demonstrating why the record is so one-sided as to rule out the prospect of the nonmovant prevailing. If the movant fails to make that initial showing, the court must deny the motion, even if the opposing party has not introduced contradictory evidence in response.

10A Mary Kay Kane, *Federal Practice and Procedure (Wright & Miller)* § 2727.1 (4th ed. 2022).

Additionally, "cross-motions [for summary judgment] must be considered separately and should not be interpreted necessarily to mean that judgment should be entered on one of them[.]"

10A Mary Kay Kane, *Federal Practice and Procedure (Wright & Miller)* § 2720 (4th ed. 2022). This is because "each party, as a movant for summary judgment, bears the burden of establishing that no genuine dispute of material fact exists and that the movant is entitled to a judgment as a matter of law." *Id.*

> The fact that one party fails to satisfy that burden on his own Rule 56 motion does not automatically indicate that the opposing party has satisfied its burden and should be granted summary judgment on the other motion. The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard. Both motions must be denied if the court finds that there is a genuine dispute of material fact. But if there is no genuine dispute and one or the other party is entitled to prevail as a matter of law, the court will render judgment.

*Id.*

### III.    Discussion: Defendant's Motion

Defendant moves for partial summary judgment on its breach of contract claim because it contends no genuine issue of material fact is in dispute. To succeed on a breach of contract claim, Defendant "must prove (1) the obligor undertook an obligation to perform; (2) the obligor failed to perform the obligation (the breach); and (3) the obligor's failure to perform resulted in damages to the obligee." *Cent. Facilities Operating Co., LLC v. Cinemark USA, Inc.*, 36 F. Supp. 3d 700, 712 (M.D. La. 2014) (citing *Favrot v. Favrot*, 2010-0986 (La. App. 4 Cir. 2/9/11), 68 So. 3d 1099, 1108–09); *Advantage Roofing & Constr. of Louisiana, Inc. v. Landmark Am. Ins. Co.*, No. 16-677, 2019 WL 919582, at *19 (M.D. La. Feb. 25, 2019) (deGravelles, J.).

Construing the evidence in a light most favorable to Plaintiffs, there are questions of material fact precluding summary judgment in Defendant's favor. Defendant's motion centers on its argument that Plaintiffs breached Section 6 of the PSA by refusing to allow it to conduct a site

6

visit on May 19, 2020.[5] (Doc. 51-1 at 11-13.) In support, Defendant relies primarily on Abe Kinney's Affidavit[6] wherein he attests that he attempted to perform an inspection on the day in question but was denied access by Plaintiffs. (Kinney Aff., Doc. 51-3 at 3-4, ¶¶ 19-22, wherein Kinney attests that he nor anyone associated with DNA was allowed to perform a site visit or tour the Properties.) Defendant also cites to Plaintiffs' Response to Request for Admission No. 4, which provides in pertinent part:

> REQUEST FOR ADMISSION NO. 4:
> Please admit that on May 15, 2020, Tameka Woods with DLP Real Estate Management refused to permit Cedar Grove or its agent access to the Properties to conduct inspections. If you deny this request, state the reasons for your denial.
>
> RESPONSE TO REQUEST FOR ADMISSION NO. 4:
> Plaintiffs object to Request for Admission No. 4 on the grounds that the request, as written, implies and/or assumes that Plaintiffs were obligated to allow Defendant to inspect the Properties on May 15, 2020. Therefore, subject to these objections, Request for Admission No. 2 is denied as written. As of May 15, 2020, the Defendant was already in breach of the Purchase Agreement for having failed to close the transactions on or before the required Closing Date.

(Doc. 70-9 at 5; *see also id.* at 4, No. 2; DeGroot[7] Affidavit, Doc. 69-26 at 9, ¶ 24.)

However, Plaintiffs have produced competent summary judgment evidence demonstrating that a site visit and/or inspection of the Park East I apartments occurred on May 19, 2020, between the approximate times of 1:47 p.m. and 2:32 p.m. and was performed by Abe Kinney or someone associated with DNA Workshop. (Doc. 69-20; Doc. 69-21; Doc. 69-29—Doc. 69-32; Doc. 69-

---

[5] Again, Section 6 of the PSA provides in relevant part: "From the Effective Date of this Agreement until the Closing Date, … Buyer and its representatives, consultants and engineers shall have reasonable access to and the right to inspect the Property[.]"

[6] Cedar Grove retained Dyke Nelson Architecture, LLC ("DNA") to provide professional architecture services to it in connection with the purchase of the Properties and/or potential post-acquisition construction relating to the Properties. (*Def. SMF* ¶ 7.) Abe Kinney was the project manager for DNA overseeing and providing the aforementioned services to Cedar Grove. (*Def. SMF* ¶ 8.)

[7] Barry DeGroot was Plaintiffs' Chief Legal Counsel during the transaction. (*See* DeGroot Affidavit, Doc. 60-7 at 1-2, ¶ 2.)

35—Doc. 69-39; Doc. 69-41; Doc. 69-42.)[8] Specifically, Plaintiffs have provided 76 photographs taken by Abe Kinney and DNA Workshop which contain metadata indicating that the photographs were taken on May 19, 2020, at or near the Park East I apartments. (*See id.*)

Thus, construing the evidence in a light most favorable to Plaintiffs and drawing reasonable inferences in their favor, a reasonable juror could conclude that Plaintiffs did not breach the PSA by not allowing Defendant to inspect the property on May 19, 2020. Consequently, Defendant's motion will be denied.

### IV. Discussion: Plaintiffs' Motion

In their motion, Plaintiffs contend that Defendant breached the PSA by: (1) failing to have its Title Company set the Closing on or before June 3, 2020; (2) failing to obtain financing/being unable to purchase the Properties as of the June 3, 2020 Closing deadline; and (3) making "express declarations" on May 13, 2020, and May 14, 2020, that it "would not and could not Close" on the PSA. (*See* Doc. 52-1.) Plaintiffs also seek a partial summary judgment declaring that Defendant's right to inspect the Property was subject to a suspensive condition that was never fulfilled, and that Cedar Grove is limited to the stipulated damages provided for in the PSA if it succeeds on its counterclaims against Plaintiffs. (*Id.*)

In short, Plaintiffs' motion will also be denied. As Defendant correctly asserts, this "case presents a deeply intensive factually inquiry making Plaintiffs' motion for summary judgment improper." (*See* Doc. 70 at 2.)

---

[8] Defendant contends that the photographs produced by Kinney and the metadata derived from the photographs are not proper summary judgment evidence. (*See, e.g.*, Doc. 76 at 10.) Plaintiffs respond generally that the photographs from which metadata was extracted are admissible as they were produced by Defendant and Plaintiffs have explained in the supporting affidavit how the metadata was derived (*see, e.g.*, Doc. 75 at 14; Doc. 75-5 at 5-6). The Court finds that these documents are admissible and competent summary judgment evidence. *Texas Ent. Ass'n, Inc. v. Hegar*, No. 17-594, 2019 WL 13036162, at *11 n.12 (W.D. Tex. Feb. 27, 2019), *aff'd*, 10 F.4th 495 (5th Cir. 2021).

8

Initially, there are numerous factual disputes as to the commencement, extension, and expiration of the Due Diligence Period.[9] This is important because under the terms of the PSA, the Closing deadline was set to occur on or before 45 days after the Due Diligence Period had expired. (PSA, Doc. 69-2 at 3, § 4.) Thus, any extension of the Due Diligence Period bears directly on Defendant's obligation (if any) to Close under the PSA.

In briefing, Plaintiffs admit that they failed to timely produce documents to Cedar Grove thereby resulting in an extension of the Due Diligence Period. (*See, e.g.*, Doc. 52-1 at 24 (This 14-day delay "resulted in the Due Diligence Period expiring on April 19, 2020.").) On this issue, Defendant has produced competent summary judgment evidence demonstrating that certain Due Diligence Materials were not produced until May 4, 2020 (if at all). (DeGroot Affidavit, Doc. 60-7 at 12, ¶ 24; Farricker[10] Depo., Doc. 70-4 at 129.) Based on this evidence, a reasonable juror could infer that the Due Diligence Period expired on May 4, 2020 (at the earliest), and thus, Defendant had no obligation to Close on June 3, 2020.

In addition, questions of fact exist as to Plaintiffs' own compliance with the PSA, potentially creating a situation in which the jury will have to determine which party breached the PSA first. For example, Aaron Gorin, the manager of Cedar Grove, testified as follows:

> Q. All right. I'll ask it again as simple as I can, and if you promise to answer the question I ask, we'll get out of here sooner, okay? But on May 31, 2020, given the circumstances that existed at that point, which were essentially that your financing had not even been approved yet by the bond commission.
>
> A. Incorrect. This contract does not require financing from a bond commission.
>
> Q. Okay. Could you have written a check on May 31 for the purchase price?
> Object to Form.

---

[9] The PSA itself anticipated a potential delay in the exchange of Due Diligence Materials, and therefore included a provision stating that "in the event that the Due Diligence Materials are not timely delivered within time period set forth in Section 9(a) below, then the Due Diligence Period shall be extended by the duration of such delay." (PSA, Doc. 69-2 at 3, § 4.)

[10] Frank Farricker was a representative of Cedar Grove and was involved in the transaction.

9

> A. The contract is a two-sided contract. It's not a unilateral contract. It's much like a marriage. You need two people to dance. So you need both the buyer and seller to agree to a consummated transaction, which has numerous contractual obligations on both sides.
>
> I can't just show up tomorrow and say, give me the deed to your house. Doesn't work like that. You have to be prepared to give me the deed. Just as the Buyer – and we're, again, still under contract. If I show up today and say, I would like the deed to this property, the Seller may say no; they may say yes.
>
> So in the context of a contract, when we've obviously demonstrated the Seller blocking Cedar Grove Capital at every turn, from completing its due diligence, such that we are still in due diligence, to the best of my knowledge, the Seller did absolutely nothing to prepare itself to close. It did not deliver a deed; it did not send any signed document to a title company; did not prepare prorations; did not prepare utility transfers; did absolutely nothing to prepare to close. There would be no possible way to acquire property without the Seller agreeing to deliver the property. And as such, it is an inaccurate question to ask if I'm willing to buy something that the Seller is not able to sell, either.

(Gorin Depo., Doc. 70-3 at 194-195.) There is also evidence that Plaintiffs failed to acknowledge that the Due Diligence Period and the Closing deadline were extended during the transaction. (*See* Complaint, Doc. 1; Notice of Default, Doc. 1-2 (notifying Cedar Grove of its default for failing to Close by May 15, 2020); Plaintiffs' Response to RFA Nos. 2, 4, Doc. 70-9 at 4, 5.)

Defendant has also produced evidence from which a reasonable juror could conclude that Plaintiffs failed to comply with their obligation to provide Defendant with requested information under Section 4 of the PSA. (Farricker Depo., Doc. 70-4 at 89 ("I asked for rent-rolls – current rent-rolls going back six months. I received none. I asked for income statements going back to December. I received none."); *id*. at 67-68, 44-45; *see also* Ruben[11] Depo., Doc. 70-1 at 165.) Unquestionably, these significant factual issues surrounding the transaction make summary judgment inappropriate.

---

[11] Anthony Ruben was the "primary point person negotiating the deal" for Plaintiffs. (Ruben Depo., Doc. 70-1 at 29.)

10

Plaintiffs also contend that Defendant anticipatorily breached the PSA by making "express declarations" on May 13, 2020, and May 14, 2020, that it "would not and could not Close" on the PSA. (Doc. 52-1 at 31.) Plaintiffs cite to two emails in support of this contention. The first email was sent on May 13, 2020, from Defendant's counsel in connection with the PSA to Plaintiffs' counsel:

> I just spoke with the buyer, who advised that the broker has been handling this issue, and that the closing is not occurring this week. I don't have further details, but was told to direct inquiries to the broker. I have also advised the buyer on the title matters and am awaiting approval.

(Doc. 69-4 at 13.) The second was sent later that same day from Gorin to a real estate broker involved in the transaction. That email states as follows:

> Here's where we stand
>
> 1. We are confirmed for the Agenda for June 10th. This has been confirmed by the secretary of [the Louisiana Housing Commission ("LHC")] in writing (email) and also by the attorney for LHC (in email). We are trying to get this on official letterhead, but for now, we have these emails. The agenda will be officially published on June 4th, 7 days before the meeting.
>
> 2. From there, it goes to the state. The next meeting will be July 16th[.]
>
> 3. From there, back to LHC. The next meeting will be August 12th[.]
>
> 4. After that, you go to bond inducement and printing $ which takes 2-3 weeks. That puts you to a closing before Labor Day. All of the above assumes that they don't cancel any more meetings (which they can't because they statutorily have to meet every month) or that we can't pull some magic and accelerate matters (which we are trying to do).
>
> All of the above assumes that they don't cancel any more meetings (which they can't because they statutorily have to meet every month) or that we can't pull some magic and accelerate matters (which we are trying to do).
>
> A long process, but we are finally narrowing down to the end goal[.]
>
> Meantime, they should keep up collections and answer questions we might have as we progress. I'll need a rent roll from each property and T12 updated each month, anything else I'll pepper you with questions but for now we have what we need.

11

(Doc. 69-3 at 1.)[12] The broker then forwarded this communication to Anthony Ruben. (Doc. 69-33; Doc. 69-3.)

Louisiana courts have long "recognized that an anticipatory breach of contract is actionable." *Andrew Dev. Corp. v. W. Esplanade Corp.*, 347 So. 2d 210, 212 (La. 1977). The doctrine "applies when an obligor announces he will not perform an obligation which is due

---

[12] Defendant objects to the emails attached to Plaintiffs' Motion on the grounds that they are not properly authenticated and therefore improper summary judgment evidence (*see, e.g.*, Doc. 70 at 35). Specifically, Defendant complains that DeGroot cannot authenticate the emails in this chain because he received some but not all of the emails and therefore lacks personal knowledge upon which to authenticate the chain. Defendant cites no case law in support of its position.

Plaintiffs respond generally that the emails are authenticated under Rule 901(b)(4) of the Federal Rules of Evidence because the emails were either produced in discovery by Defendant and/or contain distinctive characteristics and the like, or they are self-authenticating under Rule 902(11) (*see, e.g.*, Doc. 75 at 14-15).

After discussing cases from around the country on this point, the Court in *United States v. Bertram* stated:

> None of these cases specifically speak to whether an email may be authenticated under Rule 901(b)(4) by an individual that is neither a recipient nor a sender of the communication. But the weight of the case law suggests participation in a particular email is not a prerequisite to authenticating it. The case law on the whole suggests that the key consideration in email authentication is not simply whether the witness on the stand was a sender or recipient of the email, but whether the testifying witness can speak to the email's unique characteristics, contents, and appearance. After all, Federal Rule of Evidence 901 establishes a seemingly low bar for authenticating or identifying evidence in the first instance, and the characteristics set out in Rule 901(b)(4) are particularly useful in demonstrating that an email is, in fact, what it purports to be.

*United States v. Bertram*, 259 F. Supp. 3d 638, 641 (E.D. Ky. 2017); *see also United States v. Maxwell*, No. 20-CR-330, 2021 WL 5868120, at *2 (S.D.N.Y. Dec. 9, 2021) ("[C]ases have allowed a witness to authenticate emails under Rule 901(b)(4), even if they were not a recipient of the specific email being admitted, when the witness had a history and familiarity with the defendant's email communication tendencies."); *United States v. Gasperini*, No. 16-CR-441, 2017 WL 3140366, at *5 (E.D.N.Y. July 21, 2017) ("The court is unaware of any authority that authentication of emails can only come through a witness with direct knowledge of the drafting, and Defendant provides none.").

Here, the Court has reviewed the affidavit of DeGroot and finds that DeGroot "can speak to the email[s'] unique characteristics, contents, and appearance[s]" *Bertram*, 259 F. Supp. 3d at 641, and has a sufficient "history and familiarity with the [Plaintiffs'] email communication tendencies," *id.* at 644, n.1, to authenticate the disputed emails.

Furthermore, some of the emails in question were produced by Defendant in discovery and therefore, one familiar with that discovery may authenticate them. *Marentes v. State Farm Mut. Auto. Ins. Co.*, 224 F. Supp. 3d 891, 926-927 (N.D. Cal. 2016) (approving authentication of emails produced in discovery based on attorney's "declaration that she ha[d] personal knowledge of the documents based on her review of the documents" and other indicia of reliability, although the attorney "did not write, sign, use, or see others write, sign, or use the documents attached as supplemental exhibits."). Defendant's objections are therefore overruled. The Court therefore finds it unnecessary to rule on Plaintiffs' position that the emails are self-authenticating under Rule 902(11).

sometime in the future." *Latter & Blum, Inc. v. Ditta*, 223 So. 3d 54, 59-60 (La. App. 4 Cir. 2017) (quoting *Fertel v. Brooks*, 832 So. 2d 297, 305 (La. App. 4 Cir. 2002)).

Importantly, the Louisiana Supreme Court has stated that an anticipatory breach must be "a *refusal* to perform" a contractual obligation. *See Andrew Dev. Corp.*, 347 So. 2d at 213 (La. 1977) (emphasis added). Where a "party refuses and does not merely fail or neglect to comply with his contractual obligation, his refusal constitutes an active breach of the contract which relieves the other party of the obligation of continuing to perform under the contract." *Id*. at 212–13; *see also Schaumburg v. State Farm Mut. Auto. Ins. Co.*, 421 F. App'x 434, 438 (5th Cir. 2011).

In the present case, Defendant at no point in the emails indicated that it *refused* to Close on the PSA. Rather, the emails indicate Cedar Grove's continued desire to move forward with the transaction. (*See id*. ("*we are finally narrowing down to the end goal...*") (emphasis added); *see also id*. (suggesting that Plaintiffs "should keep up collections and answer questions we might have as we progress"); *see also* Doc. 51-14 at 17-18.) As such, the emails cannot be characterized as an anticipatory breach of contract. *See Pierre v. Gardner*, 53,715 (La. App. 2d Cir. 1/13/21), 311 So. 3d 574, 581-82 (Facebook messages by the defendant did not constitute an anticipatory breach of a lease/purchase agreement with the plaintiff because they did not indicate that the defendant "refused to satisfy the loan balance on the mortgage," as she was required to do; rather they indicated attempts to prevent foreclosure and, "[a]t most, the messages can be interpreted as a notification" of the plaintiff that the defendant "feared that she would not be able to perform her obligation due to financial difficulties."); *Schaumburg v. State Farm Mut. Auto. Ins. Co.*, 421 F. App'x 434, 438 (5th Cir. 2011) (Statement by insurance agency that agents would have to sign new contracts to relocate their offices was not anticipatory breach of contract, but was, at most, an expression of "intention to *terminate* [the plaintiff's] contract if he relocated his business without

first signing a new contract."); *see also Session Fixture Co., Inc. v. Pride Mktg. & Procurement, Inc.*, 2016 WL 7210349, at *5 (E.D. La. Dec. 13, 2016) (quoting *Ringel & Meyer, Inc. v. Falstaff Brewing Corp.*, 511 F.2d 659, 660 (5th Cir. 1975) ("So far as we know, no court, common-law or civil, has yet held that obvious incapability of performance due to financial difficulties constitutes anticipatory breach.")). Thus, summary judgment on this issue is also denied.

Next, Plaintiffs assert that Section 6 of the PSA is subject to a suspensive condition that was not fulfilled and, as a result, Plaintiffs were not obligated to provide Cedar Grove access to the Properties. According to Plaintiffs, the obligation of Plaintiffs to allow access, and the corresponding right of Cedar Grove and its representatives to access to the Properties, was not enforceable until both: (1) Defendant and its third-party consultants obtained and maintained the requisite insurance; and (2) Defendant delivered proof of the requisite insurance in the form of a certificate of insurance naming Plaintiffs as additional insureds. On the other hand, Defendant argues Section 6 is not subject to a suspensive condition and there is no evidence to support that Plaintiffs denied it site access on this basis.

"Conditions precedent in a contract—more properly called 'suspensive conditions' under the Louisiana Civil Code—are 'terms that suspend … a party's obligation until the occurrence of a condition.' " *Acadian Diagnostic Laboratories, LLC v. Quality Toxicology, LLC*, 965 F.3d 404, 411 (5th Cir. 2020). Louisiana law disfavors any finding that terms of a contract are suspensive conditions. *Id*. The party seeking the benefit of a suspensive condition has the burden of showing that the language of the contract compels such a construction. *Id.* (citing *Mumblow v. Monroe Broad., Inc.*, 401 F.3d 616, 620–21 (5th Cir. 2005)).

Again, Section 6 provides in relevant part:

From the Effective Date of this Agreement until the Closing Date, or earlier termination of this Purchase Agreement, Buyer and its representatives, consultants

14

>and engineers shall have reasonable access to and the right to inspect the Property…. Buyer shall provide notice to Seller at least twenty-four (24) hours prior to accessing the Property.…
>
>Buyer and its third-party consultants shall maintain (a) commercial general liability insurance with coverages of not less than $1,000,000.00 for injury or death to any one person and $2,000,000.00 for injury or death to more than one person and $1,000,000.00 with respect to property damage, and (b) worker's compensation insurance in accordance with the law of the state in which the Property is located Buyer shall deliver proof of the insurance coverage required (in the form of a certificate of insurance naming Seller as an additional insured) prior to Buyer or any of its representative's entry onto the Property.

(PSA, Doc. 69-2 at 3, § 6.)

The Court finds that Section 6 is ambiguous as it is susceptible to multiple different interpretations. *Campbell v. Melton*, 2001-2578 (La. 5/14/02), 817 So. 2d 69, 75 (A contract is considered ambiguous on the issue of intent when its terms are susceptible to more than one interpretation or there is uncertainty or ambiguity as to its provisions.).

One reasonable interpretation is the one Plaintiffs advance—that Plaintiffs had no obligation to allow Defendant to inspect the Property unless and until the occurrence of a future uncertain event (i.e., Defendant provided Plaintiffs with the requisite insurance information).

However, another reasonable interpretation is one that Defendant advances—that Cedar Grove's right to access the Property was not dependent on the occurrence of an uncertain event, but rather was an unconditional right. Given the ambiguity in this provision, the Court finds that there are fact issues as to the parties' intent precluding summary judgment. *See Sundown Energy, L.P. v. Haller*, 773 F.3d 606, 612 (5th Cir. 2014) (In Louisiana, "[a]ny doubtful provisions must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and other contracts of a like nature between the same parties."); *Amoco Prod. Co. v. Texas Meridian Res. Expl. Inc.*, 180 F.3d 664, 669 (5th Cir. 1999)

15

("[O]nly when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment.").

As Defendant emphasizes, Plaintiffs' conduct during the transaction creates a question of fact as to whether Cedar Grove's site access was subject to a suspensive condition. Plaintiffs do not point to any part of the record where this purported condition (delivering a certificate of insurance) was given as a reason for the alleged failure to allow Defendant to inspect the Properties. To the contrary, Plaintiffs admit in their discovery responses that they denied Cedar Grove site access based on the belief that Defendant had breached the PSA by failing to Close. Plaintiffs' Response to Request for Admission No. 2, provides in pertinent part:

> Plaintiffs admit that Defendant submitted a request for inspection of the Properties after the required Closing Date (as defined in the Purchase Agreement) and after Defendant was already in default under the Purchase Agreement for failing to close the transaction on or before the Closing Date. *Plaintiffs denied the inspection for that reason*.

(Doc. 70-9 at 4 (emphasis added); *see also* DeGroot Affidavit, Doc. 69-26 at 9, ¶ 24.) Thus, summary judgment is not appropriate based on Defendant's alleged failure to meet any suspensive condition.

Finally, given the number of material fact disputes as to who breached the PSA (and when) as outlined above, the Court declines to make a determination as to the validity and applicability of the stipulated damages clause in the PSA. Thus, Plaintiffs' motion is denied to the extent it requests such a finding.

V. **Conclusion**

Accordingly,

**IT IS ORDERED** that the *Motion for Partial Summary Judgment* (Doc. 51) filed by Defendant Cedar Grove Capital, LLC is **DENIED**.

**IT IS FURTHER ORDERED** that the *Motion for Summary Judgment on Plaintiff's Main Demand, Defendant's Counterclaim and alternatively, Motion for Partial Summary Judgment on the Defendant's Counterclaim* (Doc. 52) filed by Plaintiffs Baton Rouge Ventures, LLC and Charal Baton Rouge Ventures, LLC is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>September 26, 2022</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**